**TRENK, DIPASQUALE, WEBSTER,
DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Richard D. Trenk (RT 6874)
Adam D. Wolper (AW 6169)
*Attorneys for Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Case No. 09-30679 (MS) |
| | Chapter 11 |
| PLAINFIELD APARTMENTS, L.L.C. | Honorable Morris Stern |
| | Hearing Date: January 4, 2010 |
| Debtor and Debtor-in-Possession. | Hearing Time: 12:00 p.m. |

**OPPOSITION OF DEBTOR AND DEBTOR-IN-POSSESSION
PLAINFIELD APARTMENTS, L.L.C. TO SPENCER SAVINGS BANK'S
MOTION FOR AN ORDER COMPELLING A SECTION 363 SALE OF ALL
OF THE DEBTOR'S REAL PROPERTY AND FOR OTHER RELIEF**

Debtor and Debtor-in-Possession Plainfield Apartments, L.L.C. (the "Debtor"), by and through its undersigned counsel, in opposition to the motion of Spencer Savings Bank ("Spencer") for an Order compelling the Debtor to conduct a section 363 sale of all of its assets, and for other relief (the "Motion"), hereby states as follows:

**PRELIMINARY STATEMENT**

1. The Debtor submits this statement in opposition to the Spencer's Motion, in which Spencer demands (a) that the Court should compel the Debtor to conduct a section 363 sale of the Apartments; (b) that Spencer should be authorized to file avoidance actions against the Trust Beneficiaries; (c) that the Court should order that the Debtor's bankruptcy case be

converted to a case under chapter 7 of the Bankruptcy Code; and (d) that a chapter 11 trustee should be appointed in the Debtor's bankruptcy case.

2.      In addition to this statement, the Debtor specifically incorporates the following documents into its opposition to Spencer's Motion, which the Debtor previously filed in opposition to Spencer's Motion to Dismiss the Debtor's Bankruptcy Case, and/or Obtain Stay Relief (PACER Docket No. 64, hereinafter, the "<u>Previous Motion</u>"): (i) Debtor's Opposition Brief to the Previous Motion (PACER Docket No. 80); (ii) Certification of Melvin Scheinerman (PACER Docket No. 77); (iii) Certification of Valle Schloesser (PACER Docket No. 78); and (iv) Certification of David Connolly (PACER Docket No. 79). Additionally, the Debtor specifically incorporates its Initial Opposition to Spencer's Motion. (PACER Docket No. 108.)

3.      Quite simply, Spencer has not presented a single item of supporting evidence, and/or has not cited a relevant legal authority, for any of the relief that it seeks. Spencer argues that the Court should order the Debtor to conduct a section 363 sale of the Apartments (as that term is defined below) despite the fact that it has not cited any legal authority that supports its argument, and despite the fact that the Court denied Spencer's motion seeking essentially the same relief less than a month ago. Additionally, Spencer continues to arbitrarily increase the amount of its alleged claim, which has somehow grown by over a million dollars in less than a month.

4.      Further, Spencer has not taken any of the prerequisite steps necessary to obtain derivative standing to pursue avoidance claims on behalf of the estate; has not proven that it has colorable claims against the proposed avoidance defendants; and willfully overlooks the fact that it does not have a security interest in the proceeds of the Debtor's Article 5 causes of action.

5.    Moreover, Spencer's half-hearted attempt to press for conversion of the Debtor's bankruptcy case to chapter 7 of the Bankruptcy Code does not even come close to proving "cause" for conversion by a preponderance of the evidence. The Debtor has made the adequate protection payment that Spencer claims that it did not receive, and the Debtor has fully justified the management fees that it pays to Connolly Properties that Spencer takes issue with.

6.    Finally, Spencer's attempt to argue for the appointment of a chapter 11 trustee in the Debtor's bankruptcy case does not even come close to proving its claim by clear and convincing evidence. The mere fact that the Debtor made pre-petition distributions to its independent investors does not mandate appointment of a chapter 11 trustee; especially since the Debtor has already set forth in its Disclosure Statement how it intends to recover all of those monies.

## BACKGROUND FACTS

7.    Debtor is a limited liability company of the State of New Jersey. The sole member and equity holder of Debtor is Plainfield Apartments Trust (the "Trust"). The Trust's beneficiaries are all individual investors (the "Trust Beneficiaries"). David Connolly is the trustee of the Trust.

8.    Debtor owns nine (9) residential apartment complexes with a total of 289 rental units in the City of Plainfield, New Jersey ("Plainfield"). Those properties are:

- Apex Apartments at 117 Crescent Avenue, which has 42 units;
- The Cleveland at 138 East Seventh Street, which has 12 units;
- Columbia Apartments at 128 East Seventh Street, which has 28 units;
- East Front Street Towers at 600 East Front Street, which has 39 units;
- Franklin Arms at 346 Franklin Place, which has 16 units;

3

- Joyce Gardens at 611-619 Clinton Avenue, which has 40 units;

- Madison Avenue Apartments at 9-23 Madison Avenue, which has 24 units;

- Town and Country at 666-682 West Seventh Street, which has 69 units; and

- Viola's Place at 165 Crescent Avenue, which has 19 units.

9. All of the above-mentioned apartment buildings and individual units therein shall hereinafter be collectively referred to as the "Apartments." The Apartments are managed by Connolly Properties, Inc. ("Connolly Properties"). Thus, Debtor does not have any employees, because all of the workers in the Apartments are employed by Connolly Properties.

10. The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on August 7, 2009 (the "Petition Date"), and since that time has operated as a debtor-in-possession.

11. On October 6, 2009, Spencer filed a motion to dismiss the Debtor's bankruptcy case, or in the alternative, for relief from the automatic stay. After a hearing on October 30, 2009, the Court entered an Order denying Spencer's motion in its entirety.

12. On December 23, 2009, the Debtor filed its Disclosure Statement and proposed Plan of Reorganization (the "Plan"). The Plan groups the Debtor's creditors and interest holders into four classes:

    a. Class 1, which is Spencer, will receive payments of interest only at a rate of four (4%) percent per annum for the first year after the effective date of the Plan; and will receive monthly payments of principal and interest (at a rate of four (4%) percent per annum) for the next nine (9) years thereafter, based on a thirty (30) year amortization schedule, with a final balloon payment of all outstanding principal and interest at the end of that ten (10) years.

    b. Class 2, which is the secured portion of the claim of the PMUA, will receive $100,000, payable quarterly over a ten (10) year period at an interest rate of four (4%) percent per annum, based on a twenty-five (25) year amortization schedule.

4

   c. Class 3, which is the general unsecured creditors, will receive their pro-rata share of $10,000 per year for a period of ten (10) years, payable quarterly beginning on the effective date of the Plan.

   d. Class 4, which consists of the Trust and Trust Beneficiaries, will receive new equity interests in the reorganized Debtor, in exchange for a return of the Distributions (as that term is defined below).

## LEGAL ARGUMENT

13. In its brief in support of the Motion, Spencer argues the following: (a) that the Court should compel the Debtor to conduct a section 363 sale of the Apartments; (b) that Spencer should be authorized to file avoidance actions against the Trust Beneficiaries; (c) that the Court should order that the Debtor's bankruptcy case be converted to a case under chapter 7 of the Bankruptcy Code; and (d) that a chapter 11 trustee should be appointed in the Debtor's bankruptcy case.

14. For the reasons set forth below, the Debtor will show that all of Spencer's arguments are without legal justification, and are not warranted by the facts of the instant bankruptcy case.

**A.** **SPENCER'S DEMAND THAT THE COURT COMPEL THE DEBTOR TO CONDUCT A SECTION 363 SALE OF THE APARTMENTS IS SIMPLY A DISGUISED, AND NOT LEGALLY OR FACTUALLY SUPPORTED, ATTEMPT TO MAKE ANOTHER REQUEST FOR STAY RELIEF**

15. By way of its Motion, Spencer primarily seeks an order compelling the Debtor to conduct a section 363 sale of the Apartments because Spencer's interest allegedly is not adequately protected. In support thereof, Spencer argues that (a) the Debtor has not made a mortgage payment since April 2009; (b) the adequate protection payments that Spencer has made to date are not large enough; (c) the Trust Beneficiaries received distributions in the year prior to the Petition Date; (d) the Apartments' occupancy rates declined between August 2009 and October 2009; (e) the management fee that the Debtor pays to Connolly Properties is too large;

5

and (f) the Debtor's "effective gross income," which increased between September 2009 and October 2009, did not increase to a level that Spencer was content with. (Spencer Brief at 3-5.)

16. As the Debtor demonstrates below, none of those arguments justify the peculiar and unprecedented relief that Spencer seeks in the Motion.

> **(i)** **There is No Legal Authority in Support of Spencer's Demand that the Court Compel the Debtor to Conduct a Section 363 Sale of the Apartments**

17. Conveniently, Spencer did not cite a single case, statute, rule, regulation, treatise or other legal authority – aside from a perfunctory reference to the Court's equitable powers under 11 U.S.C. § 105(a) – that stands for the proposition that a court can order a debtor-in-possession to sell all of its assets by way of a section 363 sale when the debtor has not even made a motion requesting same.

18. A secured creditor has no legal right to compel a debtor-in-possession to conduct a section 363 sale of the secured creditor's collateral. Pursuant to 11 U.S.C. § 363(b)(1), "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .". 11 U.S.C. § 363(b)(1). "[W]e begin by observing that § 363(b) allows ***only*** the trustee and, in the absence of a trustee in a Chapter 11 case, a debtor in possession . . . to sell a debtor's assets other than in the ordinary course of business." In re After Six, Inc., 154 B.R. 876, 881 (Bankr. E.D. Pa. 1993) (emphasis added). Thus, it is clear that only the trustee or debtor-in-possession can seek court approval to sell assets of the bankruptcy estate.

> **(ii)** **Spencer's Motion is a Disguised Request for Stay Relief that the Court has Previously Denied**

19. That is not to say that a secured creditor has no rights; rather, the Bankruptcy Code gives secured creditors other remedies – such as the ability to move for relief from the

6

automatic stay pursuant to section 362 of the Bankruptcy Code. In fact, Spencer's argument in this regard is simply a disguised attempt to bring another motion for stay relief.

20. On October 30, 2009, the Court held a hearing on Spencer's Previous Motion, in which Spencer sought, *inter alia*, relief from the automatic stay so that it could continue its pre-petition state court foreclosure action against the Debtor. (PACER Docket No. 64.) In support of the Previous Motion, Spencer made the same exact arguments that it has asserted in the instant Motion: to wit, that Spencer's interest in the Apartments is not adequately protected, and that the value of the Debtor's estate was decreasing. (PACER Docket No. 64-2.) After full consideration of Spencer's arguments, the Court entered an Order denying the Previous Motion on November 12, 2009. (PACER Docket No. 91.) On December 8, 2009, less than a month later, Spencer brought the instant Motion, seeking the same relief but under a non-existent legal theory. It is clear that Spencer is trying to take "another bite at the apple" on its stay-relief argument by making its quixotic argument in the instant Motion.

### (iii) Even if the Relief that Spencer Seeks is Available, it is Not Warranted by the Facts Presented

21. In addition to the fact that Spencer's section 363 argument is both procedurally barred and barred by the principles of law-of-the-case and *res judicata*, its substance is also patently incorrect. Amazingly, Spencer has now arbitrarily added even more millions of dollars onto its claim against the Debtor's bankruptcy estate, yet it still has the audacity to claim that it is undersecured.

22. The numbers and dates speak for themselves. The Debtor purchased the apartments on March 3, 2003, for approximately $16,386,600. (See Certification of David Connolly in Opposition to the Previous Motion, PACER Docket No. 79.) On May 3, 2007, the Debtor refinanced its previous debt with Spencer by borrowing $17,000,000 from Spencer,

7

secured by a mortgage on the Apartments. (Id.) Between June and August 2009, Spencer conducted appraisals of all of the Apartments, and determined that the Apartments had a cumulative value of $19,610,000. (PACER Docket No. 37.) The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on August 7, 2009. Since that time, Spencer has at times asserted that it has a claim in the following amounts:

    a.    On September 11, 2009, Spencer filed its opposition to the Debtor's Motion for Use of Cash Collateral, in which Spencer asserted that it was owed **$18,806,944.65** from the Debtor. (PACER Docket No. 37.)

    b.    On October 6, 2009, Spencer filed its motion for dismissal of the Debtor's bankruptcy case, or in the alternative, for relief from the automatic stay. In that motion, Spencer asserted that as of October 31, 2009, Spencer was owed **$19,276,544.64** from the Debtor. (PACER Docket No. 64.)

    c.    On December 2, 2009, the Debtor filed its proof of claim in the Debtor's bankruptcy case, in which it asserted a secured claim in the amount of **$18,630,451.85.**[1]

    d.    On December 8, 2009, Spencer filed the instant Motion, in which it asserted that as of that date, it was owed **$19,780,208.34** from the Debtor. Notably, Spencer did not provide any evidence, or breakdown, in support of that amount.

23.    Those conflicting assertions prove two points. First, they show that Spencer's estimations of its claim against the Debtor's estate are arbitrary and unreliable. Second, they show that Spencer alters the amount of its claim to suit whatever outcome it is trying to achieve. For instance, when Spencer was arguing that it should receive adequate protection payments, it said that its claim was $18.6 million, and therefore it had a sizeable equity cushion. When

---

[1] The Debtor intends to formally object to Spencer's proof of claim.

8

Spencer was arguing for stay relief, it asserted a claim of $19.3 million, which in addition to the $450,000 secured claim asserted by the PMUA, was exactly enough to show that the Debtor had no equity in the Apartments. Finally, in support of this Motion, Spencer asserted a claim of $19.8 million, because it had to show that its own claim was significantly greater than the value of the Apartments.

24.    Moreover, even Spencer's low estimate of the amount of its allowed claim – approximately $18.6 million – is still drastically overstated. For instance, Spencer includes a prepayment penalty in the amount of $850,000. The promissory note that the Debtor issued to Spencer provides for a prepayment penalty upon acceleration. However, that provision clearly pertains to a situation where the Debtor would actually be paying the entire accelerated amount prior to the maturity date of the note. In the instant case, the Debtor has proposed a plan of reorganization whereby Spencer is paid monthly over the term of its underlying loan, and accordingly, there will be no prepayment. It is axiomatic that a secured creditor cannot receive a prepayment penalty if it has not been prepaid.

**B.    SPENCER HAS NOT, AND CANNOT, SATISFY THE PREREQUISITES FOR DERIVATIVE STANDING**

25.    Assuming that secured creditors have a right to derivative standing to prosecute avoidance actions on behalf of a chapter 11 bankruptcy estate (which is not certain, as the Third Circuit has only addressed the issue in connection with committees of unsecured creditors), Spencer has not met the necessary requirements for attaining derivative standing.

26.    In <u>Official Comm. of Unsec. Creditors of Cybergenics Corp. *ex rel.* Cybergenics Corp. v. Chinery</u>, 330 F.3d 548 (3d Cir. 2003), the Third Circuit held that creditors committees can prosecute avoidance actions on behalf of the bankruptcy estate when the debtor unjustifiably refuses to act. <u>Id.</u> at 566-67.

9

27. Pursuant to Cybergenics, courts have held that a committee may have derivative standing to initiate an avoidance action on behalf of the debtor where: (1) a demand has been made upon the statutorily authorized party to take action; (2) the demand is declined; (3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and (4) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a chapter 11 case. G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.), 313 B.R. 612, 628 (Bankr. D.N.J. 2004).

28. In this case, Spencer has not presented a single piece of evidence showing that it made a demand on the Debtor, and that the Debtor declined that demand. For that reason alone, the Court should deny Spencer's request for derivative standing.

29. Even if Spencer does request that the Debtor take action, the Debtor would not refuse that request. The Debtor has clarified in its Disclosure Statement that it has already requested that all of the Trust Beneficiaries return the distributions that they received within a year of the Petition Date (the "Distributions"). In that letter to the Trust Beneficiaries, the Debtor's counsel expressly stated that if the monies were not returned, the Debtor reserved its rights in connection with prosecuting avoidance claims against the Trust Beneficiaries. To date, at least eighteen (18) Trust Beneficiaries (including David and Donna Connolly) representing approximately $200,000 worth of Distributions, have affirmatively indicated (through non-binding responses) that they would return the Distributions in connection with the Debtor's Plan of Reorganization.

30. Further, whether a "colorable claim" exists based on a "cost-benefit analysis" is an issue that the Debtor has grappled with since the beginning of the case, and has discussed at length in its recently-filed Disclosure Statement. In its Motion, Spencer requests authority to file

10

section 547 preference claims against the Trust Beneficiaries. However, there appears to be a significant issue as to whether the Debtor was "insolvent" (a requirement pursuant to 11 U.S.C. § 547) at the time that the Distributions were made. The Debtor did not default on its debt service to Spencer until April 2009, and no Distributions were made to the Trust Beneficiaries after April 2009. Prior to April 2009, it is unclear whether the Debtor was insolvent.

31.  Moreover, there is also an issue regarding litigation costs. The majority of the Trust Beneficiaries received Distributions in the amount of $3,375 in the year prior to the Petition Date. If any of those parties have colorable defenses, the costs of litigating avoidance actions against them could easily exceed the amount of the Distribution.

32.  Finally, it should be noted that Spencer would not have priority in the proceeds of any avoidance actions. Pursuant to 11 U.S.C. § 551, "any transfer avoided under section . . . 547 . . . of this title . . . is preserved for the benefit of the estate but only with respect to property of the estate." That means that the proceeds of any avoidance actions would be distributed to creditors of the Debtor's estate pursuant to the ordinary priority scheme. In the ordinary priority scheme, secured creditors only have first priority in property that is their collateral – nothing more. The cash collateral orders in this case do not grant Spencer a lien on proceeds of Article 5 causes of action. Therefore, Spencer does not have a secured interest in the proceeds recovered in any potential avoidance actions.

**C.    SPENCER HAS NOT MET ITS BURDEN OF PROVING THAT "CAUSE" EXISTS TO CONVERT THE DEBTOR'S BANKRUPTCY CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE**

33.  "Conversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature." In re Dark Horse Tavern, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995). Section 1112 of the Bankruptcy Code

governs the issue of conversion of chapter 11 cases to chapter 7 cases. Pursuant to 11 U.S.C. § 1112(b)(1):

> Except as provided in paragraph (2) of this subsection . . . and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion . . . is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 . . . **if the movant establishes cause**.

11 U.S.C. § 1112(b)(1) (emphasis added). However,

> "Paragraph (b)(2) provides generally that dismissal or conversion under subsection (b)[1] shall not be granted if there is a reasonable likelihood that a plan will be confirmed within a certain time period and the grounds for dismissal or conversion include an act or omission for which there is a reasonable justification and which will timely be cured."

Resnick, A. & Sommer, H., BANKRUPTCY CODE, COLLIER PAMPHLET EDITION at 986 (LexisNexis, 2009); 11 U.S.C. § 1112(b)(2).

34.    Pursuant to 11 U.S.C. § 1112(b)(1), the burden of proof is on the movants to establish "cause" for conversion. Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.), 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007). The Bankruptcy Code contains a list of sixteen (16) non-exclusive factors in connection with whether the movant has established "cause" under subsection (b)(1). 11 U.S.C. § 1112(b)(4). Bankruptcy courts have wide discretion in determining whether "cause" exists and how ultimately to adjudicate the case. First Jersey National Bank v. Brown (In re Brown), 951 F.2d 564, 572 (3d Cir. 1991); In re State St. Assoc., 348 B.R. 627, 638 (Bankr. N.D.N.Y. 2006).

35.    One of the factors constituting "cause" under 11 U.S.C. § 1112(b)(4) is "gross mismanagement of the estate." "Gross mismanagement suggests some extreme ineptitude on the

part of management to the detriment of the organization . . . .[I]t must rise above simple mismanagement to achieve the level envisioned by the Code." In re Mako, Inc., 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988). Poor management alone does not warrant appointment of a trustee or conversion of a case. See In re Sundale, Ltd., 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009).

36. In this case, Spencer's **_one sentence_** argument in support of its demand that the Debtor's bankruptcy case be converted to chapter 7 does not even come close to proving the requisite "cause" for conversion. In fact, Spencer's only argument in support of conversion is that "Debtor is paying an extraordinarily high fee to Connolly Properties, Inc. . . .". In the Certification of Charles Woehrle, Spencer asserts *ad nauseum* that in Mr. Woehrle's opinion, the management fee that the Debtor pays to Connolly Properties is too high a percentage of its effective gross income. Mr. Woehrle claims – without providing any evidence whatsoever to support his assertion – that the management fee to Connolly Properties exceeds the "industry standard" of 3% to 5%.

37. Before refuting Mr. Woehrle's opinion, it must be noted that he has not set forth how he calculated the Debtor's EGI, nor what those EGI numbers actually were. He baldly states that the Debtor's management fee to Connolly Properties for October 2009 was 23.8% of EGI; however, he does not state the amount of the management fee, nor the amount of the October 2009 EGI. Thus, it is impossible to prove whether those calculations are actually correct. Additionally, he provides no support for his claim that there is actually an industry standard in the property-management industry for the amount of management fees.

38. Further, Spencer's numbers appear to be incorrect. In the Debtor's Operating Statement for October 2009, the only amounts paid to Connolly Properties that were not directly

related to the Apartments were contributions to the Connolly Properties regional and corporate payroll, which totaled $16,659. That amount is only nine (9%) percent of the Debtor's total income of $196,121.25 for October 2009, which is much less than Spencer's assertion of 23.8%.

39. In connection with the fees that Mr. Woehrle claims are too large, the Debtor already clarified at the hearing on Spencer's previous motion that all of the fees paid to Connolly properties are justified. Those fees include staff salaries and payroll obligations, front and back office operations, maintenance costs, repair and upkeep costs, and many other costs that are incident to the smooth functioning of the Apartments. Whether Spencer wants to recognize it or not, there are significant costs incident to the operation of large apartment complexes. Therefore, it is absurd for Spencer to argue that David Connolly is simply taking all of those monies and absconding with them; aside from the salary that he receives as an employee of Connolly Properties – which has been fully disclosed – Mr. Connolly receives no funds from the Debtor, either directly or indirectly.

40. Further, Spencer argues that the Debtor's case should be converted to chapter 7 because the Debtor has not made its adequate protection payment for November 2009. However, as the Debtor has already proved in its Initial Opposition to the Motion, the Debtor <u>has</u> made its adequate protection payments for both November 2009 and December 2009.

41. Finally, a conversion of the Debtor's bankruptcy case to chapter 7 of the Bankruptcy Code would have a devastating impact on the Debtor's unsecured creditors. As shown in the Debtor's Disclosure Statement and proposed Plan of Reorganization, the unsecured creditors will receive a ten (10%) percent dividend in any reorganization of the Debtor. Conversely, if the Debtor liquidates, the unsecured creditors will receive absolutely nothing.

D.  **SPENCER HAS NOT PROVED BY CLEAR AND CONVINCING EVIDENCE THAT A CHAPTER 11 TRUSTEE SHOULD BE APPOINTED IN THE DEBTOR'S BANKRUPTCY CASE**

42. "The appointment of a chapter 11 trustee is an extraordinary remedy." 1031 Tax Group, 374 B.R. at 85; see also In re SunCruz Casinos, L.L.C., 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) ("There is a strong presumption in chapter 11 cases that a debtor in possession should remain in possession absent a showing of the need for a trustee."). Section 1104(a) of the Bankruptcy Code provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of a trustee-
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

43. The burden is on the movant to prove its case by **clear and convincing evidence**. Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 385 F.3d 313, 321 (3d Cir. 2004). It is within the court's discretion, on a case-by-case basis, to determine whether conduct rises to the level of cause. In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989).

44. In the instant case, Spencer alleges that "cause" exists for appointment of a trustee because (a) the Debtor made the distributions within a year prior to the Petition Date; (b) the Debtor did not make its November 2009 adequate protection payment; (c) the Debtor's business is "rapidly deteriorating;" and (d) the management fee paid to Connolly Properties is too high. (Spencer Brief at 10.) Taken both individually and together, those reasons clearly do not constitute "cause" for appointment of a chapter 11 trustee.

45. First, as stated above, the Debtor <u>has</u> made its November 2009 and December 2009 adequate protection payments, rendering Spencer's argument moot in that regard.

46. Second, there is absolutely no support for the proposition that the Debtor's business is "rapidly deteriorating." Spencer even admits that the Debtor's effective gross income *increased* in the period between September 30, 2009 and October 31, 2009. (Woerhle Certif. ¶ 7.)

47. Further, as the Debtor has set forth in its Disclosure Statement, Connolly Properties' new systematic approach to marketing and leasing has had an ameliorative impact on the Apartments' vacancy rates and cost structures. The buildings in Connolly Properties' Plainfield portfolio – of which the Apartments are a part (constituting approximately thirty-seven (37%) of the Plainfield portfolio) – have realized an increase in occupancy. From August 2009 through October 2009, there were a total of fifty-one (51) move-ins in all of Plainfield[2]. Additionally, in furtherance of its goal of increasing the number of "rent-ready" apartments, by the end of October 2009, the Debtor had completed, or almost completed, improvements on twenty-four (24) units in the Apartments. (<u>See</u> Scheinerman Certif. in Opposition to Previous Motion, PACER Docket No. 77.)

---

[2] Debtor's affiliates own a total of 789 units in Plainfield.

48. By November 12, 2009, the Apartments had an eighty-three (83%) percent occupancy rate, with only forty-nine (49) vacancies. Continuing that steady progression, on December 21, 2009, the Apartments had an eighty-five (85%) percent occupancy rate, with only forty-four (44) vacancies. Further, between November 12, 2009, and December 21, 2009, the Debtor evicted eighteen (18) tenants who were not paying rent. Between August 2009 and October 2009, the Debtor had evicted an additional thirty-three (33) tenants that were not paying rent (See Debtor's Disclosure Statement at § 6.2.)

49. Third, it is preposterous for Spencer to argue that the Debtor is diverting and misusing its corporate assets. Spencer's only argument in support of that assertion is that the Debtor made the Distributions to the Trust Beneficiaries in the year prior to the Petition Date. However, all of those Distributions were made prior to the date when the Debtor defaulted on its debt-service obligation to Spencer, and the Debtor expressly disclosed the existence of the Distributions in its bankruptcy petition. Further, only $80,000 out of a total of approximately $555,000 went to a member of the Debtor's management team. All of the rest of the distributions were made to the Trust Beneficiaries, who had nothing to do with the Debtor's management, and were simply outside investors in a real-estate project. (See Debtor's Disclosure Statement, Exh. **"B."**)

50. Moreover, it is completely absurd for Spencer to try to analogize the instant case to the cases cited in the final paragraph on page 9 of its Brief. Three of those cases – PRS Insurance Group, Professional Accounts, and Colby – were involuntary bankruptcy cases initiated after it was discovered that the debtors' management were conducting elaborate schemes whereby they stole millions of dollars from the debtors. Sharon Steel involved a giant corporation whose management diverted millions of funds to subsidiaries and affiliates of the

17

debtor; and <u>Bibo</u> involved a situation where the debtor's principal was receiving kickbacks of fifty-percent of the management fees that the debtor was paying.

51.  None of those cases are even remotely analogous to the Debtor's situation. All but one of the Distributions were made to outside investors that had nothing to do with the Debtor's management. Further, the management fees being paid to Connolly Properties are necessary to pay the staff that operates and maintains the Apartments, as well as the materials necessary for the upkeep, repair, and rehabilitation of the Apartments.

## **CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Court deny Spencer's Motion in its entirety.

|  |  |
|---|---|
|  | **TRENK, DIPASQUALE, WEBSTER DELLA FERA & SODONO, P.C.** *Attorneys for Debtor and D.I.P.* |
| DATED:  December 28, 2009 | By:   /s/ *Richard D. Trenk*       RICHARD D. TRENK |

F:\WPDOCS\A-M\Connolly Properties\Plainfield Apartments LLC\Plainfield Opposition.doc