Vincent J. Massa, III, Esq. (1085)
JONES & JONES LLP                                    Hearing Date:  January 4, 2010 at noon
45 Essex Street
Hackensack, NJ 07601
(201) 487-3600

Helen Davis Chaitman, Esq. (4266)
PHILLIPS NIZER LLP
25 Main Street
Hackensack, NJ 07601
(201) 487-3700

Co-counsel for Spencer Savings Bank

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------
In re

                                                  Case No. 09-30679 MS

PLAINFIELD APARTMENTS LLC,                           Chapter 11

            Debtor.
-----------------------------------------------------------

---

# REPLY MEMORANDUM OF LAW OF SPENCER SAVINGS BANK IN FURTHER SUPPORT OF MOTION FOR SECTION 363 SALE AND OTHER RELIEF

### Preliminary Statement

Spencer Savings Bank, SLA ("Spencer") submits this reply memorandum in further

support of its motion (the "Motion"), for the entry of an Order (1) authorizing a sale of the

Debtor's real estate pursuant to 11 U.S.C. Section 363 in early April 2010; (2) authorizing

Spencer to prosecute on behalf of the Debtor's estate an adversary proceeding against the

1

1101313.1

Debtor's insiders and investors to avoid and recover preferential and fraudulent transfers; and, in the alternative, to convert the Debtor's Chapter 11 case to a Chapter 7 case, or for the appointment of a Chapter 11 Trustee.

## STATEMENT OF FACTS

Spencer relies upon the certifications of Charles P. Woehrle, Jr., dated September 10, 2009 ("Woehrle I"), October 26, 2009 ("Woehrle II"), and December 7, 2009 ("Woehrle III") and the exhibits thereto, as well as all of the Debtor's Chapter 11 filings and all of the prior proceedings in this case.

## ARGUMENT

### I.    SPENCER'S MOTION SHOULD BE GRANTED

The Debtor's violation of this Court's orders for adequate protection payments to Spencer, and the Debtor's filing of a bad faith Plan, demonstrate clearly why Spencer's Motion should be granted in its entirety.

### A.    Spencer Is Entitled To An Order Authorizing A Sale Of The Debtor's Real Estate Pursuant to 11 U.S.C. Section 363.

The Debtor's contention that a Section 363 Sale is not warranted ignores the following indisputable facts:

- The present balance on Spencer's debt through January 4, 2010 is $20,041,111.11, exclusive of legal fees and costs.[1] Woehrle II at Par. 12. Spencer's claim is secured by all of the Debtor's real property assets plus an absolute assignment of rents. *Id.* at Par. 4.

---

[1] Debtor's comments relating to the fluctuation of Spencer's figures (as set forth in Debtor's Statement in Opposition at p. 8) fails to take into account the fact that interest is continuing to accrue.

2

- The Debtor is operating, at a loss, using Spencer's collateral, without providing adequate protection to Spencer. Woehrle III at Par. 4 and 9.

- The Debtor has not made a timely mortgage payment to Spencer since April 1, 2009. *Id.* at Par. 3.

- Debtor has failed to keep current its payment of real estate taxes.[2]

- The Court-ordered $20,000 adequate protection payment is less than 25% of the contract debt service payment required each month.[3] The $20,000 payment (on which the Debtor defaulted) constitutes less than seven days' interest at the contract rate and less than three day's interest at the default rate in effect since May 1, 2009. *Id.* at Par. 4.

- There is no creditors' committee appointed in this case. *Id.* at Par. 12.

- The Debtor has increased significantly the management fees paid to Connolly Properties, David Connolly's management company, since the chapter 11 filing. *Id.* at Par. 8.

- While Connolly chose not to pay the PMUA, he returned to the Debtor's equity investors $550,125 in the year before the Chapter 11 filing. *See* Debtor's Schedule of Distributions to Investors Prior to Filing (Chapter 11 Schedules at 40), which is attached to Debtor's Bankruptcy Petition. The largest recipient of these payments by far was Connolly himself who, with his wife, received $84,375. Woehrle III at Par. 5. At the same time,

---

2 Debtor has not paid real estate taxes for December, leaving Spencer's Tax Escrow account approximately one month short. As of January 1, the Borrower will be due for another real estate tax payment. Taxes run approximately $90,000 per quarter, and at this time, the Bank has approximately $45,881.30 in escrow.

3 On July 1, 2009, the Note required Debtor's monthly mortgage payments to increase to include principal. This will render the $20,000 adequate protection payment less then 20% of the contract debt service payment required each month.

1101313.1

Debtor has failed to properly maintain the Apartments, leaving Debtor with insufficient cash reserves to repair elevators, boilers, and to otherwise properly service tenants.

- The Debtor's financial condition continues to deteriorate: The Debtor's schedules and filings indicate that occupancy of the Apartments declined from 88% as of August 31, 2009 to 84% as of September 30, 2009. *Id.* at Par. 6. Based on the Debtor's October 2009 rent roll, occupancy further declined to 83% representing an additional four (4) units becoming uninhabited. *Id.* The Debtor's filings also report a decline in effective gross income ("EGI") of $84,287 (or 30%) between August 31, 2009 and September 30, 2009. *Id.* The Debtor's EGI increased in the period between September 30th 2009 and October 31st 2009; however, the growth was insignificant to report a positive net cash flow. *Id.* at Par. 7. As a result, overall EGI declined by $69,250 or 26.2% during the three-month period of August 2009 through October 2009. *Id.* During this same period, management expenses paid to Connolly Properties is reported to be 13.3% of EGI at August 31, 2009; 20.4% of EGI at September 30, 2009 and 23.8% of EGI at October 31, 2009. *Id.* at Par. 8. Typically, management expenses range between 3% and 5% annually. In addition, the Debtor reported general and administrative expenses in excess of the significant management expense already reported and previously noted. *Id.*

- The City of Plainfield began an investigation of the Debtor prior to the filing of its bankruptcy petition. *Id.* at Par. 10. Connolly has pleaded guilty to a number of administrative violations relating to the Apartments. *Id.*

In these circumstances, it is terribly unfair to Spencer and the other creditors of the Debtor to allow this case to malinger in bankruptcy. The Debtor cannot possibly reorganize

4

and is simply using the protection of the Bankruptcy Court to divert and otherwise misuse

corporate assets, at a time when it cannot meet its operating expenses. *Id.*

At a 363 sale, Spencer should be entitled to credit bid up to the full amount of its

debt, as recognized by this Court pursuant to a certification that Spencer will submit on

notice to all parties in interest, prior to the sale. *Id.* By this mechanism, all parties in interest

can be assured that the maximum value can be achieved for the Debtor's assets. *Id.*

The Debtor incorrectly argues that the Court lacks the power to compel the Debtor to

conduct a Section 363 sale of the Apartments. In fact, in a Chapter 11 case, "any party in

interest, including ... a creditor ... may appear and be heard on any issue in any case under

this chapter." 11 U.S.C. 1109(b); *In re United Stairs Corp.*, 176 B.R. 359, 366 (B. D.N.J.

1995). Thus, Spencer has standing to seek a 363 sale and the Court has the power to order

one.

**B.    Spencer Should Be Authorized to File Avoidance Actions Against The Debtor's
Insiders**

The Debtor contends that Spencer does not have derivative standing to assert

avoidance claims because Spencer has not presented any evidence that it made a demand that

the Debtor assert these claims, and/or that the Debtor declined the demand. This contention

is belied by this very motion. Spencer has repeatedly raised this issue over the past several

months. The Debtor waited until December 10, 2009 to write to investors and ask them to

return their distributions so that they could be treated as "new value," entitling the investors

to retain their equity interest in the Debtor's proposed plan. This is preposterous. Clearly,

the Debtor, run by Connolly, is not competent to sue Connolly and his wife to recover the

1101313.1

$84,350 that they wrongfully took from the Debtor on the eve of bankruptcy.

The Debtor asserts that at least 18 of the 48 Trust Beneficiaries (including the Connollys) representing approximately $200,000, of the total $550,125 of Distributions, have affirmatively indicated (through *non-binding responses*) that they would return the Distributions in connection with the Debtor's Plan.  See Debtor's Statement In Opposition at p. 10; emphasis added.

However, the investors have a legal obligation to return the wrongfully distributed funds, with interest, under the Bankruptcy Code.  Their fulfilling their statutory obligation does not entitle them to retain their equity in the Debtor.  Moreover, the investors may be liable for distributions over the six-year period preceding the bankruptcy filing, not simply for distributions within one year of the filing.

The fact that approximately 40% of the distributions (21 of a total of 48) made within a year of the Debtor's filing were in the amount of $3,375 does not change the fact that the total amount of the avoidable transfers is $550,125.  The Debtor's contention that the cost benefit analysis weighs in favor of simply permitting the investors to keep the transfers is without merit.

In *In re McKeesport Steel Castings Company*, 799 F.2d 91 (3rd Cir. 1986), the Third Circuit authorized a creditor to pursue a claim on behalf of the estate and held that the general rule "that individual creditors cannot act in lieu of the trustee is often breached when sufficient reason exists to permit the breach." *Id*. at 94.  The Court considered the fact that the plaintiff "was the only creditor that would zealously pursue [the] claim" and "neither the debtor in possession nor a creditors' committee had reason to make the claim on behalf of

6

[plaintiff]" to be an important factor that weighed in favor of permitting the secured creditor

to bring the action. *Id*. Thus, the Court should authorize Spencer to sue the investors under

the avoidance provisions of the Bankruptcy Code.

**C.      Alternatively, the Case Should Be Converted To Chapter 7**

The Debtor argues that Spencer has not proven the requisite cause for conversion to a

case under Chapter 7. However, the Debtor ignores the evidence of the Debtor's

mismanagement, the Debtor's violation of the Court's order for meager $20,000/month

adequate protection payments, and its failure to pay real estate taxes; and the fact that the

Debtor has proposed a plan which is facially not confirmable. Since the Debtor cannot

possibly reorganize, conversion is appropriate.

**D.      Alternatively, a Chapter 11 Trustee Should Be Appointed**

If the Court feels there is any possibility at all for a reorganization in this case, the

Court should appoint a Chapter 11 Trustee so that the interests of creditors are protected.

The Debtor contends that Spencer's only argument in support of this relief is that the Debtor

has diverted $550,125 of corporate assets by making distributions to insiders in the year

preceding the bankruptcy. *See* Debtor's Statement In Opposition at p. 15. Of that amount,

$84,375 went to Connolly. In fact, Spencer has consistently asserted that the Debtor's

principals are siphoning funds out of the Debtor through extraordinarily high management

fees. The Debtor has never explained, for example, why its management fees have increased

significantly since April 2009.

Spencer has demonstrated by clear and convincing, indisputable evidence that cause

exists under 11 U.S.C. § 1104(a)(1) to appoint a Chapter 11 trustee in this case. There is no

7

basis in the Bankruptcy Code to impose upon Spencer and the other creditors all of the risks

of the Debtor's dishonesty.

## II.      THE DEBTOR CANNOT POSSIBLY REORGANIZE

The Debtor's proposed plan (the "Plan") demonstrates that the Debtor cannot

possibly reorganize and the Debtor's equity investors cannot possibly retain equity in the

reorganized Debtor.

## A.      The Chapter 11 Requirements for Confirmation

Under 11 U.S.C. § 1129, there are two ways for a proposed Chapter 11 plan to be

confirmed. *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc.*, 987 F.2d 154, 157

(3d Cir.1993). The first requires approval of the proposed plan by all impaired classes.  *Id.*

For an impaired class to accept the Plan, class members holding at least fifty percent of the

number of claims and two-thirds of the amount of the claims would need to vote for the Plan.

*In re Armstrong World Indus., Inc.*, 432 F.3d 507, 510 (3d Cir.2005) (citing 11 U.S.C. §

1126(c)).

If the Plan is not accepted by all impaired classes as required by section 1129(a)(8), a

court may still confirm a plan under the "cram down" provision of the Bankruptcy Code so

long as the plan meets the other requirements of section 1129(a), including the requirement

that the plan be accepted by at least one impaired creditors' class pursuant to 11 U.S.C. §

1129(a)(10),] does not discriminate unfairly and is "fair and equitable" to any dissenting

impaired class. *Armstrong World Indus.*, 432 F.3d at 511-12 (quoting 11 U.S.C. § 1129(b)(1)

and citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434,

441 (1999)).

8

The "fair and equitable" requirement for a cram down invokes the "absolute priority rule." *Id.* As codified in 11 U.S.C. § 1 129(b)(2)(B)(ii), this rule requires that "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (quotation marks and citations omitted). Thus, whether or not a plan will be confirmed may depend on how the claims are classified. *In re Fairfield Executive Assoc.*, 161 B.R. 595, 600 (D.N.J.1993).

For a Chapter 11 plan to be confirmable, the requirement of 11 U.S.C § 1129(a)(11) must be met.  This section mandates that the plan's proponent must show that confirmation of the plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

"The purpose of § 1129(a)(11) 'is to prevent confirmation of visionary schemes that promise creditors and equity security holders more under a proposed plan than the debtor could possibly attain after confirmation.'"  *In re Sound Radio, Inc.*, 103 B.R. 521, 522 (D.N.J.1989), aff'd without opinion, 908 F.2d 964 (3d Cir.1990) (citation omitted). Courts have listed several factors to consider in determining the feasibility of a Chapter 11 plan, including:

(1) the adequacy of the debtor's capital structure;

(2) the earning power of its business;

(3) economic conditions;

(4) the ability of the debtor's management;

1101313.1

(5) the probability of the continuation of the same management; and

(6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (B.D.N.J.2000) (citing *In re Temple Zion*, 125 B.R. 910, 915 (B.E.D.Pa.1991); *In re Landmark at Plaza Park, Ltd*., 7 B.R. 653, 659 (B.D.N.J.1980)).

Proof that the plan is feasible is more difficult when the proposed payout to creditors, as in the Plan, is extended over a long period of time (ten years). *In re Rack Eng'g Co.*, 200 B.R. 302, 306 (B.W.D.Pa .1996).

**B.**     **The Plan is Not Confirmable**

The Plan is not confirmable for the following reasons:

(1)   The Plan is not feasible because the Debtor has no right to use the rental income and for other reasons.

(2)   The Debtor proposes that its equity interests will be retained because the Debtor's investors will return fraudulently transferred funds back to the Debtor as "new value."  This is a patent violation of the "new value" exception.

(3)   The Debtor has improperly classified the PMUA in order to assure that one impaired class votes for the Plan.

(4)   The Debtor does not propose to pay Spencer a market rate of interest on its mortgages.

(5)   The lack of equity infusion by the Debtor's equity interests forces Spencer to assume all the risks of the Debtor's reorganization.

10

1101313.1

(6)   The Plan was not proposed in good faith.

**(1)        The Plan Fails the Feasibility Test**

The feasibility test under Section 1129(a)(11) of the Bankruptcy Code provides that, in order for a plan to be confirmed, confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan.  *Berkeley Federal Bank & Trust v. Sea Garden Motel & Apt. Lodge, Inc.,* 195 B.R. 294, 304 (D.N.J. 1996).  In determining whether a plan meets to requirements of § 1129(a)(11), … "the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable."  *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Piles Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985) (quoting *In re Monnier Bros.*, 8 Cir., 379 F.2d 55, 64).  In addition, "section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow fund to maintain both its operations and obligations under the plan." *S&P, Inc. v. Pfeifer*, 189 B.R.173, 183 (N.D. Ind. 1995) (quoting *In re SM 104 Ltd.,* 160 B.R. 202, 234 (B.S.D. Fla. 1993)).

Here, the Plan is improperly premised upon the Debtor using the rents that it collects from the Apartments as cash collateral.  *See* the Plan at Article IV.  However, "[i]t is settled in New Jersey that an assignment of rents passes title to the assignee." *In re Jason Realty*, 59 F.3d 423 (3d Cir.1995) (quoting *Paramount Bldg. & Loan Ass'n of Newark v. Sacks*, 107 N.J.Eq. 328, 152 A. 457 (N.J.Ch.1930)).  Assignments of rents are considered interests in real property and accordingly are created and defined by the law of the situs of the real

11

1101313.1

property. See *Jason Realty*, 59 F.3d at 427;  *In re Bridgepoint Nurseries, Inc.*, 190 B.R. 215, 219 (B.D.N.J.1996).

A bankruptcy court is not permitted to "upend the property law of the state in which it sits, for to do so would encourage forum shopping and allow a party to receive 'a windfall merely by reason of the happenstance of bankruptcy.' " *Id.* (quoting *Butner*, 440 U.S. at 55). Thus, in determining if an assignment of rents is absolute and transfers title or, instead, creates a security interest, a bankruptcy court must ensure the creditor "is afforded . . . the same protection [it] would have under state law if no bankruptcy had ensued." ' *Jason Realty*, 59 F.3d at 427 (quoting *Butner*, 440 U.S. at 56).  New Jersey law accordingly governs.  *In re Carretta*, 220 B.R. 203 (D.N.J. Feb 06, 1998).

*Jason Realty* concerned a single-asset limited partnership which owned and operated a building in New Jersey for retail and office use. See *Jason Realty, supra,* 59 F.3d at 425. The *Jason Realty* creditor held a note, a mortgage and an assignment of leases which included an assignment of rents which assigned the leases, rents, income and profits from the property to the creditor, but granted the debtor the privilege to collect and keep the rents unless a default occurred. *Id.*

The debtor defaulted, filed for protection under Chapter 11 shortly thereafter, and the creditor argued the assignment was absolute, that title in the leases and rents was vested in the creditor and that the debtor merely held a revocable license to collect the rents. *Id.*  Three documents established the Jason Realty debtor-creditor agreement: a note, a mortgage, and an assignment of leases. See *Id*. at 426.  At the outset, the Jason Realty court observed that property of an estate consists of all property in which a debtor holds an interest upon the

12

1101313.1

commencement of the case. *Id.* (citing 11 U.S.C. § 541(a)(1),(6)). Observing that assignments of rents are interests in real property, the *Jason Realty* Court concluded that state law determines whether the creditor held an absolute assignment or merely a security interest in the leases and rents. *Id.* at 427 (citing *Butner v. United States*, 440 U.S. 48, 55(1979); *Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 37 (3d Cir.1993)).

The *Jason Realty* Court held, under New Jersey law, "[a]n assignment is absolute if its language demonstrates an intent to transfer immediately the assignor's rights and title to the rents" and if the parties "mutually agree[ ] in words of the present to transfer full title to the rents." *Jason Realty, supra,* at 427 (citations omitted).

Here, Spencer holds an Absolute Assignment of Rents, Profits & Lease (the "Assignment") which immediately vests in Spencer the right to collect the rents from the Property, with a revocable license back to the Debtor. *See* Woehrle I at Par. 11; *see* also Exh. A hereto. The Debtor defaulted in its obligation to pay the monthly mortgage payments on May 1, 2009 and did not make a single payment to Spencer thereafter, prior to its August 7, 2009 chapter 11 filing. Woehrle III at Par. 3. By the terms of the Assignment, the license was revoked immediately upon default. See Exh. A at page 3, Par 2, which provides as follows:

> Upon or at any time after default in the payment of the principal sum, interest and indebtedness secured hereby and by said Mortgage or in the performance of any obligation, covenant or agreement herein or in said Note, Mortgage or Leases contained on the part of the Assignor to collect the rents, income and profits arising under the Leases or from **the Property shall be automatically and immediately revoked without further notice to or demand upon Assignor**, and Assignee shall have the right to exercise any one or more of the following rights....

13

1101313.1

*Id.*; emphasis added.

Since the filing of the Petition, Debtor has been using the rents collected from the tenants to fund its operations in violation of Spencer's absolute entitlement to the rents pursuant to the Assignment. The Plan proposes using the rents assigned to Spencer to fund the Plan. *See* the Plan at Article IV. However, because these rents are not property of the Debtor's estate, they may not be used to fund the Plan. *Commerce Bank*, 5 F.3d at 38. In fact, no provision of the Bankruptcy Code permits the Debtor to "create" an interest in the rents to enable it to use Spencer's property in a plan of reorganization. *Id.*

Therefore, in the circumstances of this case, the rents are unavailable for use, allocation or utilization in any plan proposed by the Debtor and the Debtor cannot possibly fund the Plan from any other source.

Moreover, the Debtor cannot demonstrate that its Plan is feasible, even if it could use the rents to fund its operations. The Debtor maintains that its business is improving and, in support of this, states that the Debtor's effective gross income ("EGI"), increased in the period between September 30, 2009 and October 31, 2009. However, the Debtor's cash flow, while under the protection of the bankruptcy court and while paying a mere $20,000 per month of the $104,671.92 in contract debt service (Principal and Interest) due to Spencer under its loan, EGI averaged only $206,119.68 between August 2009 and November 2009. This amount is approximately 72.2% of the cash flow that the Debtor will need under the Plan in order to service the interest portion on Spencer's secured claim in the first fifteen months of the Plan.

14

1101313.1

The Debtor's schedules and filings indicate that occupancy of the Apartments declined from 88% as of August 2009 to 83% as of November 2009.  The Debtor's filings also report a decline in EGI of $84,279 (or 31.7%) between August 31, 2009 and November 30, 2009.  *Id.*

In light of the above, and under all reasonably likely scenarios, the Debtor will not have adequate cash flow to properly service the amount of Spencer's secured claim under the Plan.

**(2)  The Plan Discriminates Unfairly and Is Not Fair and Equitable to Spencer**

Section 1129(b)(2)(A) of the Bankruptcy Code provides, in relevant part, that a plan must not discriminate unfairly and must be fair and equitable with respect to each class of claims or interest that is impaired under, and has not accepted, the plan.  *Id.*  The condition that a plan be fair and equitable with respect to a class of secured claims, includes the following requirements:

> (i)  that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

> (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property

> (iii)  for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) and (iii) of this subparagraph; or

> (iv) for realization by such holders of the indubitable equivalent of such claims.

15

11 U.S.C. § 1129(b)(2)(A).

The Plan discriminates unfairly and is not fair and equitable to Spencer because, among other reasons, it does not provide for a sufficient interest rate in connection with the required payments to Spencer, insiders receive preferential treatment, there is no basis to put the PMUA in a different class from other unsecured creditors, and the Plan does not provide for an equity infusion.

**(a)  The Plan Fails to Provide for a Sufficient Interest Rate on Spencer's Debt**

In order to confirm the Plan, the Court would have to find that the Plan pays Spencer a market rate of interest.  Although the Bankruptcy Code does not set forth a required interest rate in this situation, the cases have elucidated that a secured creditor must be paid a market rate of interest.  *See Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)(a chapter 13 case);  *In re Cantwell*, 336 B.R. 688(B.D.N.J.2006).

In *Till*, the Chapter 13 debtors sought to pay back a truck loan over the course of the Chapter 13 plan by making payments equal to the value of the truck plus interest calculated at a rate of 9.5%, reflecting a prime rate of 8.0% and a risk factor of 1.5%. The creditor sought the contract loan rate of 21%, offering evidence that the contract rate was the rate used for subprime loans, or loans to borrowers with poor credit ratings.

Under section 1325(a)(5)(B), where the debtor proposes to retain a secured creditor's collateral, the secured creditor is required to receive property in the plan whose total "value, as of the effective date of the plan, ... is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii).

16

1101313.1

The Supreme Court recognized that making payments that equal or exceed the present value of the claim "is easily satisfied when the plan provides for a lump-sum payment to the creditor." *Till,* 541 U.S. at 474. With payments over time, however,

> A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore is to choose an interest rate sufficient to compensate the creditor for these concerns.

*Id.*

In choosing the appropriate interest rate, the Court noted three significant considerations. First, the Bankruptcy Code includes other present value provisions and the Court assumed the likelihood "that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions." *Id.* In this regard, the Court cited to provisions in sections 1129(a), 1129(b), 1173(a), 1225(a) and 1228(b). *Id.* at 475 n. 10. Second, the Court recognized that "Chapter 13 expressly authorizes a bankruptcy court to modify the rights of any creditor whose claim is secured by an interest in anything other than 'real property that is the debtor's principal residence." *Id.* at 475 (citing to 1322(b)(2)). Third, the Court read "the cram down provision [to] mandate[ ] an objective rather than a subjective inquiry." *Id.* at 476. The Court explained that although the Code:

> entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cram down loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cram down" loan precludes the latter result: By

17

1101313.1

definition, a creditor forced to accept such a loan would prefer instead to foreclose. Thus, a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose.

Id. at 476-77.

Analogizing to Chapter 11, the Court remarked in footnote 14 that:

This fact helps to explain why there is no readily apparent Chapter 13 "cram down market rate of interest": Because every cram down loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cram down lenders. Interestingly, the same is not true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. (citations omitted). Thus, when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure.

*Id*. at 477 n. 14.

With these three considerations in mind, the Court rejected the coerced loan, the presumptive contract rate, and the cost of funds approaches, adopting instead the formula approach. *Id*. The formula approach "begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Id*. at 478- 79.

The Court added that "if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cram down loans." *Id*. at 479 n. 18. Otherwise, because there is some risk that the debtor will be unable to pay, the court should add a percentage to reflect the relative risk of

1101313.1

nonpayment. The Court did not set a scale for the risk factor, but noted that "other courts

have generally approved adjustments of 1% to 3%." *Id.* at 480.

Following the decision in *Till*, questions have arisen as to whether the *Till* analysis

applies in Chapter 11 cases. *See, e.g.*, Richard E. Mikels and Adrienne K. Walker, *The

Developing Impact of Till v. SCS on Chapter 11 Reorganizations*, 24-JAN Am. Bankr. Inst. J.

12 (2006); Ronald F. Greenspan and Cynthia Nelson, *"UnTill" We Meet Again, Why the Till

Decision Might Not be the Last Word on Cramdown Interest Rates*, 23-JAN Am. Bankr. Inst.

J. 48 (2005). Very few published decisions have addressed this question.

In *In re American HomePatient, Inc.*, the Sixth Circuit declined "to blindly adopt

*Till's* endorsement of the formula approach for Chapter 13 cases in the Chapter 11 context."

420 F.3d 559, 568 (6th Cir.2005). Instead, following the reference in footnote 14 of the

Supreme Court's opinion, the Sixth Circuit determined "that the market rate should be

applied in Chapter 11 cases where there exists an efficient market. But where no efficient

market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula

approach endorsed by the *Till* plurality." *Id.* Thus, in a Chapter 11 case, the court should

look first to the relevant market, and if one does not exist, then turn to the formula approach.

Similarly, Judge Raslavich in *In re Prussia Associates* interpreted *Till* to mean that

"other things being equal, the formula approach should be followed in Chapter 11 just as in

Chapter 13." 322 B.R. 572, 589 (B.E.D.Pa.2005). However, departure from the formula

approach in the Chapter 11 context may be appropriate "where an efficient market exists

which may obviate the need for resort to the formula approach, or perhaps lessen the virtues

of that approach." *Id.* "The Supreme Court's dicta implies that, where there is an efficient

19

market, the bankruptcy court should exercise discretion in evaluating an appropriate cram

down interest rate by considering the availability of market financing." *Id.* Concluding that

there was insufficient evidence of the availability of market financing, Judge Raslavich

defaulted to the formula approach. See also *In re Mirant Corp.*, No. 03-46590-DML-11,

2005 WL 3471546, (B.N.D.Tex. Dec.9, 2005) (finding *Till* relevant to the determination of

value); *see also, In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 2319201

(B.M.D.N.C. Sept.22, 2005); *In re LWD, Inc.*, 332 B.R. 543, 556 (B.W.D.Ky.2005).

The *American HomePatient* and *Prussia Associates* decisions confirm that the three

considerations identified in *Till* are equally relevant in the Chapter 11 context.  As *Till* noted,

the present value provisions of Chapter 13 carry over to section 1129.  Likewise, just as

Chapter 13 debtors may modify secured claims under section 1322(b)(2), Chapter 11 debtors

may modify creditors' rights under section 1123.  Finally, the "objective economic analysis"

required under Chapter 13 "to treat similarly situated creditors similarly," and to ensure that

"the debtor's interest payments will adequately compensate all such creditors for the time

value of their money and the risk of default," is equally applicable to Chapter 11 cases. 541

U.S. at 477.

Footnote 14 in *Till* suggests that "it might make sense [when picking a cram down

rate in a Chapter 11 case] to ask what rate an efficient market would produce."  *Id.* at 477 n.

14.  The suggestion is not inconsistent with the Court's assumption that Congress intended

that essentially the same approach to choosing an interest rate for present value be followed

in Chapters 11, 12 and 13.  Rather, the footnote provides "a further explanation of how the

1101313.1

goals set forth by the Court can best be accomplished in the context of a chapter 11 case."

*Mikels and Walker*, 24-JAN Am. Bankr. Inst. J. 12.

Here, the Debtor proposes to pay Spencer interest at a rate of 4%. Spencer's note requires Debtor to pay interest at a rate of 6.25%, with a default rate of 16.25%.4 No "efficient market" exists to refinance the Mortgages on the Debtor's Property. Therefore, assuming that the Court uses the formula approach, the analysis begins with the national prime rate (3.25%) adjusted to account for the "greater risk of nonpayment" that bankruptcy debtors typically pose. *Id*. at 479. The risk adjustment should consider "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* Here, the risk of nonpayment is very high, warranting an adjustment to the prime rate in an amount of at least 5%.

**(b)  The Plan's Proposed Retention of Equity is Insupportable**

The absolute priority rule, which is codified at 11 U.S.C. § 1129(b)(2)(B)(i) and (ii), provides that "a dissenting class of unsecured creditors must be provided for in full before any junior class of unsecured creditors can receive or retain any property under a reorganization plan." See *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202 (1988). However, most courts have recognized a so-called "new value exception" to the absolute priority rule. *In re Sovereign Group*, 1985-27, Ltd., 142 B.R. 702, 708 (E.D.Pa.1992); *In re*

---

4   Spencer's contract rate is consistent with the pre-bankruptcy contracts rates of mortgage loans obtained by the Debtor's affiliates. For example, the contract interest rate set forth in the promissory notes between Fulton-Harrison, LLC, 158 South Harrison Associates, LLC, 179 South Harrison, LLC, and Cypress House and Citibank is 6.77%. The contract interest rate set forth in the promissory note between Carteret Arms, LLC and New York Community Bank is 6% (through 2012).

1101313.1

*Wynnefield Manor Assocs.*, L.P., 163 B.R. 53, 56 (B.E.D.Pa.1993). This exception provides

that:

> where there is an infusion of new capital by the debtor, or by the principals of
> the debtor, in exchange for their continued retention of the reorganized
> debtor's property, most courts have acknowledged that the strictness of the
> requirements of the [absolute priority rule] may be relaxed.

*In re Wynnefield Manor Assocs.*, L.P., 163 B.R. at 56 (citing Matter of Snyder, 967 F.2d

1126, 1128-31 (7th Cir.1992)).

The new value exception to the absolute priority rule "allows existing equity holders

to retain (*i.e*., buy back) their ownership interests in the reorganized debtor over the objection

of any senior dissenting unsecured creditor class that is not being paid in full if the equity

holders make a new capital contribution to the debtor that meets certain criteria." *In re*

*Haskell Dawes*, Inc., 199 B.R. 867, 871 (B.E.D.Pa.1996).

A Chapter 11 plan proponent calling upon the new value exception has the burden of

proving that the equity holders' capital contribution is: (1) "in the form of money or money's

worth"; (2) "necessary to the reorganization"; (3) "reasonably equivalent to the value of the

interest being retained"; (4) "up front"; and (5) "substantial. " *Haskell Dawes*, 199 B.R. at

872 (citations omitted).  "A rigorous showing as to these requirements is necessary in order

to ensure that a debtor's equity holders do not eviscerate the absolute priority rule by means

of contrived infusion."  *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 301 (D.N. J.

1996) (quoting *In re Tallahassee Assocs*., L.P., 132 B.R. 712, 717 (B.W.D.Pa.1991)).

The new value exception to the absolute priority rule will only apply "where the

infusion of capital comes from an 'outside' source*." In re Cipparone*, 175 B.R. 643, 645

22

(B.E.D.Mich.1994); *see also, In re S.A.B.T.C. Townhouse Ass'n, Inc*., 152 B.R. 1005, 1010

(B.M.D.Fla.1993) ("[T]he existing equity holders must contribute something to the Debtor

that does not already belong to the Debtor or to which the Debtor is not already entitled").

*See also, In re Sea Garden Motel & Apartments*, 195 B.R. 294, 301 (D.N.J.1996).

For purposes of 11 U.S.C. § 547, "new value" is defined as money or money's worth

in goods, services, or new credit, or release by a transferee of property previously transferred

to such transferee in a transaction **that is neither void nor voidable under any applicable

law**, including proceeds of such property, but does not include an obligation substituted for

an existing obligation. *Stewart v. Barry County Livestock Auction, Inc. (In re Stewart)*, 282

B.R. 871, 873 (8th Cir. BAP 2002); 11 U.S.C. § 547(a)(2); (emphasis added).

Here, on the eve of bankruptcy, the Debtor chose to make equity distributions to its

investors which clearly are voidable under the Bankruptcy Code.  Woehrle III at Par. 5.  The

Debtor's proposal that the return of these wrongful distributions will constitute "new value"

entitling the investors to retain their equity in the Debtor is insupportable and demonstrative

of the Debtor's bad faith.

Moreover, even if the pre-petition distributions do not constitute preferential

payments, the investors would not be entitled to maintain their respective interests in the

reorganized Debtor unless the "new value," *i.e.,* the returned distributions, equals the value of

their retained interests.

**(c)  The PMUA is a General Unsecured Creditor**

Section 1122 governs the way in which claims or interests are to be classified within

a Chapter 11 plan and provides that "a plan may place a claim or an interest in a particular

23

1101313.1

class only if such claim or interest is substantially similar to the other claims or interests of

such class." 11 U.S.C. § 1122(a). "One clear rule emerges" in the courts regarding "§1122

classification: thou shalt not classify similar claims differently in order to gerrymander an

affirmative vote on a reorganization plan ." *In re Greystone III Joint Venture*, 995 F.2d 1274,

1279 (5th Cir.1991), *cert. denied*, 506 U.S. 821 (1992).

"The similarity of claims is determined by their legal status in relation to the debtor";

therefore, generally, "unsecured claims will ... comprise one class, whether trade, tort,

publicly held debt, or a deficiency of a secured creditor because they are claimants of equal

legal rank entitled to share pro rata in values remaining after the payment of secured and

priority claims." *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93,

99 (D.N.J.1993)

Under *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir.1987), the

classification of claims must be reasonable.  In *John Hancock Mut. Life Ins. Co. v. Route 37

Bus. Park Assoc.*, 987 F.2d 154, 159 (3d Cir.1993), the Court of Appeals explained that

gerrymandering is not permissible:

> this determination must be informed by the two purposes that classification
> serves under the Code: voting to determine whether a plan can be confirmed and
> treatment of claims under the plan. Thus, where ... the sole purpose and effect of
> creating multiple classes is to mold the outcome of the voting, it follows that the
> classification scheme must provide a reasonable method for counting votes. In a
> "cram down" case, this means that each class must represent a voting interest
> that is sufficiently distinct and weighty to merit a separate voice in the decision
> whether the proposed reorganization should proceed. Otherwise, the
> classification scheme would simply constitute a method for circumventing the
> requirement set out in 11 U.S.C. § 1129(a)(10)[ ].

1101313.1

Here, in light of the fact the Court has indicated that the PMUA is an unsecured creditor, there is no basis to put the PMUA in a separate class or to treat the PMUA differently from other general unsecured creditors.

**(d)  The Plan Impermissibly Places All of the Risk on Spencer**

The Plan does not require an equity infusion by the existing investors.  David Connolly, and the entities and trusts controlled by him, including the Plainfield Apartment Trust (the Trust"), will retain control and ownership of the Debtor and the Apartments, even though no equity will be contributed by them.  Therefore, under the Plan, Spencer is taking all of the risks and Connolly is taking none.  This is also unjust because under the Plan, Connolly will be entitled to all of the potential appreciation of the Property, and Spencer will be entitled to none.  The Plan effectively treats Spencer as an equity partner - - but as an equity partner with no potential upside.

**(3)      The Plan Was Not Proposed in Good Faith**

Section 1129(a)(3) of the Bankruptcy Code provides, in relevant part, that the court shall confirm a plan only if the plan has been proposed in good faith.  *Id.*  "[F]or purposes of determining good faith under section 1129(a)(3) … the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corporation,* 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir. 1986) (quoting *In Re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).

The debtor has the burden of establishing good faith. *Solow v. PPI Enters. (U.S.) (In re PPI Enters. (U.S.))*, 324 F.3d 197, 211 (3d Cir. 2003) (citing *In re SGL Carbon Corp.*, 200

25

F.3d 154, 162 n. 10 (3d Cir. 1999)).  The Third Circuit has directed courts to consider the

totality of the circumstances in assessing the good faith of a Chapter 11 petition.  *Id.*  A good

faith determination must be a fact sensitive, case-by-case inquiry.  *Id.*

The facts indicate that this is not a good faith Debtor:

- Connolly wrongfully returned equity to investors (including $84,375 to
himself) on the eve of bankruptcy.

- Connolly paid the Debtor's principals exorbitant management fees yet
flagrantly violated the Court's orders to pay Spencer a mere $20,000 per month in adequate
protection payments.

- The Plan proposes that the investors retain their equity by returning
wrongfully withdrawn funds.

- The Plan places all of the risk of Connolly's demonstrated lack of integrity on
Spencer.  *See, e.g., Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994 (E.D. Va. 1994)).

Accordingly, the Plan will not achieve a result which is in any way consistent with

the objectives and purposes of the Bankruptcy Code as required by Section 1129(a)(3).

## CONCLUSION

For the foregoing reasons, Spencer respectfully requests that the Court enter an Order

(1) scheduling a Section 363 sale of the Debtor's real property for early April 2010; (2)

authorizing Spencer to prosecute on behalf of the Debtor's estate an adversary proceeding

against the Debtor's insiders and investors to avoid and recover preferential and fraudulent

transfers; and, in the alternative, to convert the Debtor's Chapter 11 case to a Chapter 7 case,

or, alternatively, for the appointment of a Chapter 11 Trustee.

26

1101313.1

December 31, 2009

By: /s/ Vincent J. Massa III, Esq.

JONES & JONES
45 Essex Street
Hackensack, New Jersey 07601
(201) 487-3600

- and -

By: /s/ Helen Davis Chaitman, Esq.


Crew Schielke, Esq. (6410)
PHILLIPS NIZER LLP
25 Main Street – Suite 601A
Hackensack, New Jersey 07601
(201) 487-3700

Co-Counsel for Spencer Savings Bank, SLA

27

1101313.1